**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF CALIFORNIA; UNITED STATES OF AMERICA, *Plaintiffs-Appellees*, v. IIPAY NATION OF SANTA YSABEL, AKA Santa Ysabel Band of Diegueno Mission Indians, AKA Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation; SANTA YSABEL INTERACTIVE, a tribal economic development entity; SANTA YSABEL GAMING COMMISSION; SANTA YSABEL TRIBAL DEVELOPMENT CORPORATION; ANTHONY BUCARO; DAVID CHELETTE; MICHELLE MAXCY; VIRGIL PEREZ; BRANDIE TAYLOR; DAVID VIALPANDO, *Defendants-Appellants.* | No. 17-55150 D.C. Nos. 3:14-cv-02724-AJB-NLS 3:14-cv-02855-AJB-NLS OPINION |

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted March 16, 2018
San Francisco, California

Filed August 2, 2018

Before:  M. Margaret McKeown, Julio M. Fuentes,[*]
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

**SUMMARY**[**]

**Tribal Gaming**

The panel affirmed the district court's summary judgment in favor of the State of California and the United States in their action seeking injunctive relief prohibiting Iipay Nation of Santa Ysabel from continuing to operate Desert Rose Casino.

Desert Rose Casino is exclusively a server-based bingo game that allows patrons to play computerized bingo over the internet.  Iipay Nation is a federally recognized Indian tribe with tribal lands located in San Diego County, California.

The panel held that Iipay Nation's operation of Desert Rose Casino violated the Unlawful Internet Gambling Enforcement Act ("UIGEA").  The panel held that the Indian Gaming Regulatory Act protected gaming activity conducted on Indian lands, but the patrons' act of placing a

---

[*] The Honorable Julio M. Fuentes, United States Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

bet or wager on a game of Desert Rose Casino while located in California, violated the UIGEA, and was not protected by the Indian Gaming Regulatory Act.   The panel further held that even if all of the "gaming activity" associated with Desert Rose Casino occurred on Indian lands, the patrons' act of placing bets or wagers over the internet while located in a jurisdiction where those bets or wagers were illegal made Iipay Nation's decision to accept financial payments associated with those bets or wagers a violation of the UIGEA.

## COUNSEL

Scott D. Crowell (argued), Crowell Law Office-Tribal Advocacy Group, Sedona, Arizona; Little Fawn Boland, Ceiba Legal LLP, Mill Valley, California; Kevin C. Quigley, Foley & Quigley PLC, Saint Paul, Minnesota; for Defendants-Appellants.

Glen F. Dorgan (argued), Assistant United States Attorney, United States Attorney; United States Attorney's Office, San Diego, California; William P. Torngren, Deputy Attorney General; Sarah J. Drake, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Plaintiffs-Appellees.

**OPINION**

BEA, Circuit Judge:

This case presents an issue of first impression: Does the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq.*, permit an Indian tribe to offer online gaming to patrons located off Indian lands in jurisdictions where gambling is illegal? Because we conclude that the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361, *et seq.*, bars the activity at issue in this case, we affirm the district court's order granting summary judgment to the State of California and the United States.

I

The Iipay Nation of Santa Ysabel ("Iipay") is a federally recognized Indian tribe. Iipay's tribal lands are located in San Diego County, California. Iipay operated a traditional, brick-and-mortar casino on its tribal lands, but the casino failed and Iipay no longer conducts traditional gambling activity at the casino.

In an effort to revitalize its gaming revenue stream, Iipay launched Desert Rose Bingo ("DRB"). DRB is a server-based bingo game that allows patrons to play computerized bingo over the internet. Like traditional bingo, participants in DRB purchase cards labeled with a grid of numbers. Numbers are then drawn and, if the numbers drawn correspond with the numbers on the player's card, the numbers on the card are covered or "daubed." A player wins by daubing numbers on the card in a pre-determined pattern.

Iipay operated DRB through its wholly owned subsidiary, Santa Ysabel Interactive ("SYI"), on a set of servers that are located in Iipay's now-defunct casino on tribal lands.  Unlike other computerized bingo games, Iipay does not provide any physical computer terminals located on Iipay's tribal lands at which patrons can play DRB.  Instead, Iipay offered DRB to all California residents over 18 years of age exclusively through the internet.[1]

A patron must access DRB by navigating to desertrosebingo.com using a web browser on a computer or other internet-enabled device, such as a tablet or cell phone.  The patron must then register, create an account, and fund the account (either via a credit card or an electronic funds transfer).

After a patron has funded his account, he can select a bingo game in which to participate, ranging in value from $.01 to $1.00.  Once the patron selects a denomination of game in which to participate, the patron is presented with a "Request Form" popup window.  In the Request Form window, the patron selects the number of games he would like to participate in (up to five games), the number of cards per game the patron would like to play (up to 500 cards per game), and the "playback theme" the patron would like the post-game video to appear.[2]

After the patron is satisfied with his selection of denomination of game, number of games, and number of

---

[1] Iipay limited the game to California residents who were in state at the time of logging on by using a geolocation server and geolocation software to identify and verify the location of users who accessed DRB.

[2] For instance, in a demonstration DVD provided by the parties, the playback video is shown in a "Jurassic theme" and features a dinosaur.

cards, the patron clicks the "Submit Request!" button on the Request Form.  The patron is then presented with a "System Message" stating that the request has been submitted and "accepted" by DRB.  After the Request Form is submitted, the patron's account is debited for an amount equal to the denomination of game the patron chose, multiplied by the number of games and cards per game the patron selected.

After the patron's request is accepted, the patron can view the request under the "Requested" tab on DRB's main page.  The Requested tab shows the information from the Request Form—denomination of game, number of games, number of cards per game, and playback theme.  The Requested tab also displays the number of "proxies," which corresponds with the number of patrons registered to participate in the game, and a timer.  Once the number of patrons participating in the game reaches the pre-determined minimum number of participants set by DRB, the timer begins to count down.

When the timer reaches zero, the patrons' wagers are logged as "completed," and the outcome of the game is determined.  Technically, by submitting the Request Form, the patron has appointed an individual located at the casino, on Iipay's tribal lands, as the patron's "proxy."  There is always one SYI employee located at the casino that serves as the "Patron's Legally Designated Agent" and is responsible for representing all patrons.[3]

Serving as a Patron's Legally Designated Agent does not require any affirmative action, such as actually daubing the

---

[3] SYI also employs approximately a half-dozen "proxy monitors" who assist in monitoring the operation of the software and hardware components of DRB.

bingo card, by the proxy.  Instead, the proxy is a passive observer and the DRB software automatically conducts all aspects of gameplay, from drawing the numbers to daubing the cards.  Thus, the "playing" of the game requires no actual action on the part of the patron, the Patron's Designated Agent, or any other human.  The last human action in a game of bingo conducted through DRB occurs when the patron clicks the "Submit Request!" button.

Shortly after the game is completed, the patron can navigate to the "Completed" tab and view the results of the bingo game.  Under the completed tab, the patron can choose to view a video replay of the completed bingo game, which is presented in the selected graphical theme (e.g., Jurassic). The replay video shows the bingo card the patron purchased and a video recreation of the numbers being drawn and daubed.  At the end of the video, the patron is informed whether and how much the patron won.  The patron's account is then credited with any winnings.

Iipay launched DRB on November 3, 2014.  On November 18, 2014, the State of California and the United States (collectively, the "Government") sued Iipay seeking injunctive relief prohibiting Iipay from continuing to operate DRB.  On December 12, 2014, the district court issued a temporary restraining order prohibiting Iipay from continuing to operate DRB during the pendency of this litigation.  DRB has remained dormant ever since.

After discovery, the State of California and the United States filed separate motions for summary judgment.  The State of California sought summary judgment on two grounds.  First, California claimed that Iipay's operation of DRB violated the tribal-state compact between California

and Iipay regarding Class III gaming.**[4]**   The district court rejected this argument, finding that DRB was a Class II game that was not subject to the tribal-state compact.**[5]**

Second, California and the United States jointly argued that Iipay's operation of DRB violated the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. § 5361, *et seq*.  Iipay argued that the UIGEA did not apply to its operation of DRB because DRB was conducted on tribal lands and, as a result, was legal under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq*.  The district court ruled that DRB violated the UIGEA and entered a permanent injunction prohibiting Iipay from operating DRB.  Iipay appealed the district court's grant of summary judgment.

## II

We review the district court's grant of summary judgment de novo and may affirm on any ground supported by the record.  *Phoenix Mem'l Hosp. v. Sebelius*, 622 F.3d 1219, 1224 (9th Cir. 2010).  Statutory interpretation presents a question of law, which we also review de novo.  *Id*.

---

**[4]** The Indian Gaming Regulatory Act categorizes various forms of gambling into three different "Classes."  Bingo is ordinarily a Class II game, which can be conducted on tribal lands without approval from the state where the tribal lands are located.  *See* 25 U.S.C. §§ 2703(7)(A)(i), 2710(a)(2).  However, California argued that features of DRB rendered it an "electronic facsimile" of bingo, making DRB a Class III game, which cannot be conducted on tribal lands unless it is permitted by a tribal-state compact.  *See* 25 U.S.C. §§ 2703(7)(B)(ii), 2703(8), 2710(d).

**[5]** California did not cross-appeal the district court's denial of its motion for summary judgment based on its tribal-state compact claim.  As a result, that issue is not before us on appeal.

### III

This case presents an issue of first impression regarding the interrelation between IGRA and the UIGEA.  No other circuit has opined on whether an Indian tribe can offer online gaming to patrons located off Indian lands in jurisdictions where such gambling is illegal.  The issue hinges on the interpretation of the key provisions of IGRA and the UIEGA.  Thus, to analyze this issue, it is helpful to review the statutory framework of IGRA and the UIEGA.

### A.  *The Statutory Framework*

IGRA was passed to provide a regime for regulating gaming on Indian lands.  It provides that "[a]ny class II gaming on Indian lands shall continue to be within the jurisdiction of the Indian tribes."  25 U.S.C. § 2710(a)(2).  As discussed above, DRB (like other forms of bingo, generally) is a Class II game.  *See* discussion *supra* at 8 n.4.  Thus, if DRB takes place on Indian lands, it is under Iipay's jurisdiction, provided Iipay complies with certain regulatory requirements that are not at issue here.[6]

---

[6] We note that Congress passed IGRA in 1988—a few years before the internet became publicly available.  Pub. L. No. 100-497, 102 Stat. 2467 (1988).  Congress made clear that this was "[a]n Act to regulate gaming *on Indian lands*" because "Federal law d[id] not provide clear standards or regulations for the conduct of gaming *on Indian lands*."  *Id.* (emphasis added).  Befitting the technology of the time, IGRA envisioned bingo with "electronic, computer, or other technologic aids."  *Id.* at 2468.  But the statute nowhere referenced the internet, or other networking capabilities that reach beyond Indian lands.

The UIGEA was passed to regulate online gambling.[7]
*See* 31 U.S.C. § 5361.   Unlike IGRA or other gambling
regulations, the UIGEA does not make gambling legal or
illegal directly.   Instead, the UIGEA makes it illegal for a
"person engaged in the business of betting or wagering"
knowingly to accept certain financial payments from an
individual who is engaged in "unlawful Internet gambling."
31 U.S.C. § 5363.  Unlawful internet gambling occurs when
an individual places or receives a "bet or wager by any
means which involves the use, at least in part, of the Internet
where such bet or wager is unlawful under any applicable
Federal or State law in the State or Tribal lands *in which the
bet or wager is initiated, received, or otherwise made*."
31 U.S.C. § 5362(10)(A) (emphasis added).   A "bet or
wager" includes "staking or risking" something of value,
purchasing a lottery ticket, or transmitting "any instructions
or information pertaining to the establishment or movement
of funds by the bettor or customer in, to, or from an account
with the business of betting or wagering."   31 U.S.C.
§ 5362(1).

Thus, the UIGEA does not prohibit otherwise legal
gambling.  But the UIGEA does create a system in which a
"bet or wager" must be legal both where it is "initiated" and
where it is "received."   This requirement makes sense in
light of how the internet operates.  If a bet merely had to be
legal where it was received, a bettor could place an illegal
bet (on a game of poker, for instance) from anywhere in the

---

[7] When Congress passed UIGEA in 2006, it found that "[n]ew
mechanisms for enforcing gambling laws on the Internet [we]re
necessary because traditional law enforcement mechanisms are often
inadequate for enforcing gambling prohibitions or regulations on the
Internet, especially where such gambling crosses State or national
borders." 31 U.S.C. § 5361.

United States, so long as the bet was legal in the jurisdiction hosting the servers for a game (Las Vegas or Atlantic City, for instance, in the case of online poker). In effect, the UIGEA prevents using the internet to circumvent existing state and federal gambling laws, but it does not create any additional substantive prohibitions.

## B. Iipay's Operation of DRB Violates the UIGEA

The parties' main point of contention is whether the "gaming activity" related to DRB occurs exclusively "on Indian lands" and, thus, under Iipay's jurisdiction.[8] Iipay contends that the "gaming activities" related to DRB consists of the operation of the servers on Iipay's lands, which determine the patterns on the bingo cards, draw the numbers, and daub the cards. Iipay argues that any activity conducted by the patrons outside of Iipay's lands—such as selecting the denomination and number of games the patron would like to participate in and submitting the patron's request through DRB's website—are merely pre-game communications between the patron and the Patron's Designated Agent. Finally, Iipay argues that, to the extent the terms "gaming activities" or "on Indian lands" are ambiguous, they must be

---

[8] Both parties refer to "gaming activity" throughout their briefing. This is likely due to the fact that most IGRA cases, including *Michigan v. Bay Mills Indian Community.*, 134 S. Ct. 2024 (2014), the leading Supreme Court case, address Class III gaming. The provisions related to Class III gaming use the phrase "gaming activities . . . on Indian lands." 25 U.S.C. § 2710(d)(1). The provisions related to Class II gaming, which is the relevant topic in this case, refer to "Class II gaming on Indian lands." 25 U.S.C. § 2710(a)(2). There does not appear to be a difference between the meaning of "gaming" and "gaming activity" in the context of the statute. For consistency with the parties' briefing, we also refer to "gaming activity." "Gaming" is the gambling industry's preferred term for "gambling."

construed in Iipay's favor.   *See Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992) (stating that statutes are to be construed liberally in favor of Indian tribes and ambiguities should be resolved in their favor).[9]

The Government argues, consistent with the district court's opinion, that "gaming activity" is not ambiguous. Citing *Michigan v. Bay Mills Indian Community.*, 134 S. Ct.

---

[9] Iipay acknowledges that there are no cases directly on point. However, it argues that this court's decision in *AT & T Corporation v. Coeur d'Alene Tribe*, 295 F.3d 899 (9th Cir. 2002), can provide "guidance." *Coeur d'Alene* is not helpful in this case. In *Coeur d'Alene*, an Indian tribe established a national telephone lottery, which would allow participants to purchase lottery tickets for a lottery held on tribal lands over the telephone from anywhere in the country. *Id.* at 901. The tribe contracted with AT&T to provide toll-free telephone service for the lottery. *Id.* The tribe's agreement with AT&T was approved by the National Indian Gaming Commission (the "NIGC"). *Id.* at 902. Despite the approval of the NIGC, several states informed AT&T that they viewed the lottery as illegal and threatened legal action. *Id.*

AT&T brought a declaratory judgment action in federal court seeking a determination that it was not required to provide toll-free telephone service for the lottery. *Id.* at 903. The tribe argued that the lottery was protected under IGRA. *Id.* The district court granted summary judgment to AT&T, concluding that IGRA did not protect the lottery because patrons purchased lottery tickets from off Indian lands. *Id.* We reversed the district court, but did so without reaching the merits of the IGRA argument. *Id.* at 905–10. Instead, we held that AT&T did not have standing to bring the suit because the legality of its contract with the tribe was subject to the NIGC's approval and that approval constituted a final agency action which had to be challenged under the APA. *Id.* Because we did not address the merits of the IGRA issue presented by *Coeur d'Alene*, and Iipay does not contend that the NIGC has approved DRB, *Coeur d'Alene* does not provide a precedent we must follow.

2024 (2014), the Government contends that "gaming activity" under IGRA is "the gambling in the poker hall," as opposed to "off-site licensing or operation of the games."[10] *Id*. at 2032–33. The Government argues that the "gambling" in this instance, is the patron's decision to wager money on the bingo game, which occurs off Indian lands.

We reject Iipay's argument that the patron's decision to submit a requested wager of a particular monetary denomination is merely a pre-gaming communication with the patron's designated proxy. The district court found that it was uncontested that the act of clicking "Submit Request!" by a patron was a "bet or wager" within the meaning of the UIGEA. The district court based this finding on the fact that the patrons were staking something of value on the outcome of the bingo game, but the court could have just as easily found that the patrons were giving "instructions or information pertaining to the establishment or movement of funds by the bettor or customer in, to, or from an account with the business of betting or wagering." *See* 31 U.S.C. § 5362(1). Additionally, the district court found that DRB's patrons were located in California when they clicked the

---

[10] In *Bay Mills*, a tribe with its tribal lands located in the state of Michigan opened a casino in Michigan, but off of its tribal lands. 134 S. Ct. 2028–30. In order to avoid the tribe's sovereign immunity defense, Michigan attempted to sue the tribe under IGRA, arguing that the tribe's operation of the casino fell within the statute's scope. *Id.* Specifically, Michigan argued that although the casino was located off of Indian lands, the tribe licensed the casino and completed administrative functions from its headquarters on its tribal lands. *Id.* at 2030–35. Michigan contended that these actions were "gaming activity" and could be enjoined through IGRA. *Id.* The district court granted a preliminary injunction to Michigan, the tribe appealed, and the Sixth Circuit vacated the injunction. 134 S. Ct. 2028–30. The Supreme Court affirmed, holding that the administrative actions that occurred on tribal lands were not "gaming activity" and thus were not subject to IGRA. *Id.* at 2030–35.

"Submit Request!" button and that betting on bingo violates California law.  *See* Cal. Penal Code § 330 (prohibiting "percentage games").  Iipay does not contest these findings on appeal.

Two key conclusions can be drawn from these uncontested findings.  First, as the Government argues, the patrons are engaging in "gaming activity" by initiating a bet or a wager in California and off Indian lands.  Consistent with the Supreme Court's holding in *Bay Mills*, the act of placing a bet or wager is the "gambling in the poker hall," not "off-site licensing or operation of the games."  134 S. Ct. at 2032–33.  As a result, it seems clear that at least some of the "gaming activity" associated with DRB does not occur on Indian lands and is thus not subject to Iipay's jurisdiction under IGRA.[11]

Second, these uncontested facts undermine Iipay's position that IGRA can shield DRB from the application of the UIGEA.  Iipay has admitted that patrons initiate bets or wagers within the meaning of the UIGEA while located in California, where those bets are illegal.  Even if DRB is completely legal in the place where the bet is accepted, on

---

[11] Iipay argues that if the term "gaming activity" is ambiguous, it must be construed in favor of Iipay. *See Cty. of Yakima*, 502 U.S. at 269. Although this is true, the Supreme Court's ruling in *Bay Mills* undercuts Iipay's argument that the phrase is ambiguous.  Justice Sotomayor, writing for the Court, held that gaming activity "means just what it sounds like . . . the gambling in the poker hall, not the proceedings of the off-site administrative authority."  134 S. Ct. at 2032–33.  The Court also made clear that IGRA "regulate[s] gaming on Indian lands, and nowhere else."  *Id.* at 2032.  Iipay provides no basis to depart from this common sense, straightforward analysis.  Additionally, as discussed below, even if this court accepts Iipay's definition of "gaming activity," the UIGEA still applies to DRB.  *See* discussion, *infra* at 14–17.

Iipay's lands, the bets are not legal in the jurisdiction where they are *initiated*, in this case California.[12]  Thus, when Iipay accepts financial payments over the internet as part of those bets or wagers, Iipay violates the UIGEA.

In this respect, Iipay's argument regarding proxies actually works against Iipay's position.  Iipay argues that the patron's action in selecting a wager amount and clicking "Submit Request!" is pre-gaming communication with the proxy, not "gaming activity."   But if clicking "Submit Request!" is not "gaming activity" within the meaning of IGRA, but merely an administrative issue, it cannot be protected by IGRA.  *See Bay Mills*, 134 S. Ct. at 2032–33 (holding that IGRA's provisions do not apply to administrative activities that are unrelated to the "gambling in the poker hall").  That conduct is, however, subject to the provisions of the UIGEA as a "bet or wager" initiated through the internet.[13]  As a result, whether Iipay is correct that no "gaming activity" occurs off Indian lands or not, Iipay's operation of DRB violates the UIGEA.

Iipay argues strenuously that this analysis is flawed because any determination regarding the legality of DRB

---

[12]  Iipay argues that the location of a bet or wager should be determined under contract principles and that a contract (including a wager) is formed in the place of acceptance.  But Iipay's argument ignores the plain statutory text of the UIGEA, which prohibits bets or wagers that are illegal in either the jurisdiction where the bet or wager is *initiated* or where the bet or wager is received.  31 U.S.C. § 5362(10).

[13] As noted above, even if the court accepts Iipay's argument that no "bet or wager" in the traditional sense has occurred when the patron clicks the "Submit Request!" button, the patron has certainly provided "instructions or information pertaining to the establishment or movement of funds by the bettor or customer in, to, or from an account with the business of betting or wagering."  31 U.S.C. § 5362(1).

must be made exclusively through examining IGRA, without reference to the UIGEA. This is so, Iipay contends, because the UIGEA does not contain any substantive prohibitions on previously legal gambling and expressly provides that "no provision" of the UIGEA "shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361. Thus, Iipay argues, if DRB would have been legal in the absence of the UIGEA, it must remain legal after the UIGEA's passage.

On this point, Iipay's argument fails for two reasons. First, absent a direct conflict, courts should give effect to co-existing federal statutes. *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992). Here, there is no direct conflict between IGRA and the UIGEA and, thus, we give effect to the provisions of both statutes.

Second, although Iipay is correct that the UIGEA does not alter IGRA, that does not mean that the UIGEA did not outlaw certain financial transactions associated with gaming on Indian lands facilitated by the internet, a topic on which IGRA is silent.[14] Indeed, Congress clearly contemplated that the UIGEA might apply to games played on Indian lands

---

[14] That Iipay's interpretation of the UIGEA's scope is unworkable is demonstrated by applying Iipay's logic to other potential situations. For instance, because the UIGEA specifies that it does not alter either federal or *state* laws regarding gambling, a state like Nevada could theoretically make the same argument advanced by Iipay to justify accepting wagers over the internet made by residents of other states. Effectively, Nevada could argue that accepting wagers in its jurisdiction was legal before the UIGEA and, thus, must be legal after its passage as well. Given the realities of the internet, this interpretation would render the UIGEA all but meaningless.

because it specifically exempted certain intra- and inter-tribal games from the UIGEA's scope.  *See* 31 U.S.C. § 5362(10)(C) (exempting bets or wagers "initiated and received or otherwise made exclusively" on a single tribe's land or multiple tribal lands, provided that the relevant tribal ordinances and regulations permit such bets or wagers).

What Iipay's arguments fail to acknowledge is that the UIGEA does not have to make DRB the game illegal in order to make Iipay's operation of that game—specifically, its decision to accept wagers and financial payments over the internet from patrons located in California—illegal. Whether DRB is permitted by IGRA or not, Iipay's operation of DRB violates the UIGEA's requirement that bets placed over the internet be legal both where they are initiated and where they are received.  Thus, it can be true that the UIGEA did not alter IGRA, and it can also be true that DRB is subject to and violates the UIGEA.[15]

In summary, Iipay is correct that IGRA protects gaming activity conducted on Indian lands.  However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.  Further, even if Iipay is correct that all of the "gaming activity" associated with DRB occurs on Indian lands, the patrons' act of placing bets or wagers over the internet while located in a jurisdiction where those bets or wagers is illegal makes Iipay's decision to accept financial

---

[15] We take no position on whether Iipay would violate the UIGEA by accepting DRB bets or wagers exclusively from patrons located in jurisdictions where bingo is legal.

payments associated with those bets or wagers a violation of the UIGEA.

Because Iipay's operation of DRB violates the UIGEA, we **AFFIRM** the district court's order granting summary judgment to the Government.